[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Charles E. Williams, Inc., is the owner of a CT Page 1312 certain parcel of land in the Town of New Miiford on Dorwin Hill Road consisting of 31.154 acres of unimproved land. There are approximately 1.2 acres of wetlands and watercourses on the property. The defendant is the Inland Wetlands Commission of the Town of New Milford, which is the inland wetlands and watercourse agency of the town as designed by Section 22a-42 of the General Statutes.
On or about January 8, 1997, Williams applied to the Commission for a permit to conduct certain regulated activities in connection with the subdivision of the property into a twenty-eight lot affordable housing subdivision pursuant to the Affordable Housing Land Use appeals procedures of Chapter 126a of the General Statutes. (See Return of Record, Items 2 through 6, Exhibit A through E.)
The regulated activities for which Williams applied included the crossing of two narrow wetland/watercourse areas with twenty four inch culverts for a driveway, and to construct three dwellings, a portion of three septic systems, four wells and a portion of two driveways within seventy-five feet of wetlands and within one hundred feet of a watercourse. These activities were to have taken place on lots 13, 14, 27 and 28. Williams also applied to construct a portion of a detention basin within the regulated area which detention basin would receive stormwater runoff and discharge same to an existing watercourse.
The Commission held a public hearing on Williams' application on April 3, 1997 and the hearing was continued to April 24, 1997 and May 8, 1997 and May 22, 1997. At the continued public hearing held on May 22, 1997 Williams proposed two alternatives to the original plan submitted. (ROR Item 50, Exhibit VV.) The first alternative was the elimination of lots 27 and 28, and the second alternative was the elimination of lots 27, 28, 13 and 14. With the elimination of the four lots, the only regulated activities were the detention basin and stormwater discharge from the detention basin. (ROR, Item 52, Exhibit XX at pages 8 through 11.)
Notwithstanding the fact that the Commission and Williams had agreed in writing to extend the time period for the completion of the public hearing until July 2, 1997 (ROR Item 45, Exhibit QQ), and notwithstanding the fact that the Commission requested additional information at the May 22, 1997 hearing, the Commission closed the hearing on May 22, 1997. On June 26, 1997 the Commission denied Williams' application. (ROR Items 55 and 56, CT Page 1313 Exhibits AAA and BBB.)
The plaintiff is aggrieved by the decision of the Commission which denied its application.
The plaintiff appeals the decision of the Commission pursuant to General Statutes § 22a-43 which is the specific statutory authority permitting the appeal of a decision of a municipal inland wetlands agency. It provides in pertinent part: "[a]ny person aggrieved by any regulation, order, decision or action made pursuant to sections 22a-36 to 22a-45, inclusive, by the . . . municipality . . . may, within the time specified in subsection (b) of section 8-8 . . . appeal to the superior court for the judicial district where the land affected is located."
"Aggrievement requires a showing that the plaintiffs have a specific, personal and legal interest in the subject matter of the decision as distinguished from a general interest such as is the concern of the community as a whole, and that the plaintiffs were specifically and injuriously affected in their property or other legal rights." Schwartz v. Town Plan and Zoning Commission,168 Conn. 20, 25 (1975); Hughes v. Town Planning and Zoning Commission,156 Conn. 505, 507 (1968).
The Commission's decision is largely based on Williams' alleged failure to submit information required by the Commission. Some of the information sought by the Commission related to the proposed activities on lots 13, 14, 27 and 28 which the applicant conceded could be eliminated from consideration by the Commission. Specifically, the Commission requested grading details regarding a wetlands crossing which was eliminated with the elimination of the four lots. (ROR Item 52, Exhibit XX at pages 8 through 11.) In addition, in its motion to deny Williams' application, the Commission claimed that Williams failed to submit "design specifics" for feasible and prudent alternatives. As indicated, Williams presented two alternatives, one that eliminated lots 27 and 28, and one that eliminated lots 13, 14, 27 and 28. These alternatives, if adopted, would result in the elimination of regulated activities on the lots in question. There is no reason to require additional design specifics for activities which would not occur if the Commission elected that option.
Some of the information the Commission claims was not before it had in fact been presented by Williams' consultants during the hearing by documentation and testimony. The Commission requested CT Page 1314 a stormwater management plan, and this was contained in both the original submission with the application as well as in subsequent revisions prepared in response to the comments of the Commission and its consultants. (ROR Item 6, Exhibit E, Item 18, Exhibit Q, Item 42, Exhibit NN and Item 50, Exhibit VV.)
The Commission requested information regarding the advantages and disadvantages of the proposed detention basin or, in lieu thereof, a riprap velocity dissipation channel, and this information was presented to it by the submission of revised plans at the May 22, 1997 meeting (ROR Item 50, Exhibit VV) and by the testimony of Williams' engineer, Ralph Gallagher. There was a discussion concerning the advantages and disadvantages of the proposed detention basin at the continued public hearing held on May 8, 1997. (ROR Item 46, Exhibit RR at pages 49 and 50) and at the continued public hearing held on May 22, 1997. (ROR Item 52, Exhibit XX, at pages 4 through 6.) Mr. Gallagher stated in his testimony.
 "[w]e have both on sheet, the third sheet of the package, 87-013-1R9, 100 scale, and the next sheet 87-013-3R7, we show a riprap ditch beginning at the terminus of the storm drain . . . traversing across the Connecticut Light and Power easement to the southwest and turning at the south to the brook showing a 3' wide by 4' deep riprap swale two side slopes . . . 18" high riprap . . . every 50'."
(ROR Item 52, Exhibit XX at page 5.)
The Commission requested details regarding the hydraulic capacity of the soils to accept the anticipated leachate for the proposed septic systems. In his report to the Commission, the Commission's consultant, Harry Shepard, suggested that this information should be submitted to the Commission (ROR Item 36, Exhibit HH) because of his misinterpretation of the design and purpose of the swale shown on the plans submitted with the application. Mr. Gallagher further stated that these septic systems met the public health code. (ROR Item 52, Exhibit XX at page 28.)
The Commission requested information to support Williams' legal authority to construct the detention basin in an area that is subject to an easement to the Connecticut Light and Power Company, CT Page 1315 and Williams, through its counsel, presented this authority which is contained in the language of the document granting the easement to Connecticut Light and Power which is recorded in Volume 97 at Page 555 of the New Milford Land Records. As read into the record by Williams' counsel the easement provides, "reserving however to ourselves, ourselves being the grantors, to our heirs' and assigns, the right to use the land except for structures beneath said electrical lines and elsewhere within said right of way but no use of the land whatsoever shall interfere or obstruct the right herein granted or endanger said electrical lines or their operation whenever they are erected, so that our rights that we can do anything on the land, other than to build structures and we will give you our opinion formally if you want, we have given it to the Planning Commission that we believe that that gives us the right to build the proposed detention pond and especially in light of the fact that there are no electrical wires there at this point and time. The easement seems to have been practically abandoned even though it exists on paper." (ROR Item 52, Exhibit XX at page 7.) The Commission took administrative notice of the easement for the record. (ROR Item 52, Exhibit XX at page 8.) Subsequent to the decision of the Commission, Williams received written approval from Connecticut Light and Power Company to locate its detention basin within the easement area.
The Commission requested details with regard to the impact of the subdivision on the existing eroding watercourse, and this information was presented to it in both the original erosion and sedimentation control plans (ROR Item 6, Exhibit E) and in subsequent revisions to the plans (ROR Item 18, Exhibit Q, Item 28, Exhibit 28, Item 42, Exhibit NN and Item 50, Exhibit VV). In addition, Williams' engineer submitted supplemental erosion calculations detailing the velocity of the outflow from the detention basin to the watercourse (ROR Item 44, Exhibit PP), and there was extensive discussion of erosion control measure at the continued public hearing held on May 8, 1997. (ROR Item 46 at pages 26 through 37.) Counsel for Williams summarized the information presented by Mr. Gallagher and by soil scientist Henry Moeller by documentation and testimony by stating "the stream has natural riprap in it today. We're going to join our artificial riprap to the natural boulders in the stream . . . there will be no opportunity for erosion in between the natural and the artificial ripraps placed there . . ." (ROR Item 46, Exhibit RR at page 32.)
Because the Commission prematurely closed the public hearing on May 22, 1997 (in violation of its agreement with Williams to CT Page 1316 extend the close of the hearing to July 2, 1997), Williams had no choice but to submit documents to the Commission's consultants subsequent to the close of the public hearing. These documents were responsive to concerns raised by the Commission on and prior to May 22, 1997, and their submission was made in order to allow the Commission's consultants to provide the Commission with the technical and professional assistance it required in order to reach its decision on Williams' application.
The Commission and its consultant requested that Williams submit stormwater routing calculations for the proposed detention facilities for the 5, 10, 25, 50 and 100 year storm events. The calculations for 25 year storm events was contained in the initial submission to the Commission. (ROR Item 3, Exhibit B.)
The Commission requested details regarding a liner for the proposed detention facility. As indicated-by Mr. Gallagher at the continued public hearing held on May 22, 1997 an additional note had been added to Mr. Gallagher's plans submitted at that meeting (ROR Item 50, Exhibit VV) which stated that the proposed detention basin would be lined with "high density polyethylene . . . palm liner as provided by Cultec Incorporated" (ROR Item 52, Exhibit XX at page 4), Mr. Gallagher indicated that further detail had not been provided since it would not be known whether the liner was necessary until after the detention basin was dug or deep tests performed within that area of the detention basin in order to determine whether or not the bottom of the basin contained rock. (ROR Item 52, Exhibit XX at page 18.) Counsel for Williams suggested that the Commission require a further sign off based on field conditions that were encountered when the pond was dug. (ROR Item 52, Exhibit XX at page 19.) The Commission's consultant asked, "Why can't you get some test pits now" (ROR Item 52, Exhibit XX at page 18), and Williams' consultant performed such tests and submitted this information to the Commission's consultant. Based on this information it is apparent that the liner was not necessary because no rock was encountered. Had the Commission not closed the hearing on May 22, it would have had this information available to it in order to make a reasoned decision on Williams' application.
The Commission deprived Williams of the opportunity to respond directly to the Commission prior to the close of the hearing. It was clear that the Commission understood that Williams would need a significant amount of time in order to respond to all of the comments of the Commission and its consultants. When Williams' counsel requested that the Commission grant a thirty (30) day CT Page 1317 extension for the close of the public hearing, the Commission's chair, Marsha LaTour, responded, "I think that we need to go full time considering the amount of detail." (ROR Item 46, Exhibit RR at page 57.) After this discussion, an agreement was signed by the Commission and Williams' counsel which provides that the public hearing would not have to be closed until July 2, 1997. (ROR Item 45.) The Commission denied Williams' right to an approval by choosing not to refer the material required by its consultants for review and report back to the Commission.[1] It appears that the Commission attempted to find and succeeded in finding procedural grounds for denying Williams' application by closing the hearing before Williams had an opportunity to respond. The Commission bases its decision in large part on Section 7.7 of its Regulations (ROR Item 60) which provides "at any time prior to the close of the public hearing, the Commission may require the applicant to provide additional information about the regulated area or regulated activity which is the subject of the application, or wetlands or watercourses affected by the regulated activity."
In this case, the Commission requested Williams to submit material at and prior to the continued public hearing of May 22, 1997 and prior to the close of the public. hearing. This information was to be submitted for review by the Commission's consultants after the close of the public hearing. After this information was submitted, the Commission refused to permit its consultants to review the information or to consider it in the final decision for the project. (ROR Item 54, Exhibit ZZ) The Commission apparently took the position that it cannot receive information after the close of the hearing, when the plain language of the regulation is that it can request information prior to the close of the public hearing without setting a limit on when it can be received by the Commission's consultants. The caselaw clearly limits the Commission's right to review the information after the close of the public hearing, but does not limit their consultants from receiving requested additional information and reporting back to the Commission after the close of the public hearing. The caselaw clearly allows the Commission to review such reports from its consultants. See Holt-Lock. Inc. v. Zoning PlanningCommission, 161 Conn. 182, 184-185, 286 A.2d 299 (1971) and McCrannv. Town Plan Zoning Commission, 161 Conn. 65, 77-78, 282 A.2d 900
(1971).
The closing of the hearing on the Williams' application on May 22, 1997 contrary to the agreed upon extension to July 2, 1997 was an arbitrary and illegal act by the Commission. The Commission was CT Page 1318 required to consider the additional information requested prior to making its decision.
The Court finds that this arbitrary act by the Commission was illegal and a denial of a fair hearing to the plaintiff. It is a judgment of the court that the appeal be sustained and that the matter be remanded to the defendant for further hearing in accordance with law.
HON. WALTER M. PICKETT, JR. State Judge Referee